DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
By:    JENNIFER ONG
        Assistant United States Attorney
        26 Federal Plaza, 38th Floor
        New York, New York 10278
        (212) 637-2224

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                                    :
UNITED STATES OF AMERICA,
                                                                    :
            Plaintiff,
                                                                    :
            -v.-                                                          VERIFIED CIVIL COMPLAINT
                                                                    :    FOR FORFEITURE
$878,177.99 FORMERLY ON DEPOSIT IN
WELLS FARGO ACCOUNT 3538891296,            :    24 Civ. 4874
HELD IN THE NAME OF "BULLPIX
SOLUTIONS LLC," AND ALL MONIES,            :
FUNDS AND ASSETS TRACEABLE
THERETO,                                                        :

            Defendant-*in-rem*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

            Plaintiff United States of America, by its attorney, Damian Williams, United States

Attorney for the Southern District of New York, for its verified civil complaint, alleges, upon

information and belief, as follows:

## I. JURISDICTION AND VENUE

            1.        This action is brought pursuant to Title 18, United States Code, Sections

981(a)(1)(A), 981(a)(1)(C) and 984, by the United States of America seeking the forfeiture of

$878,177.99 formerly on deposit in Wells Fargo Account 3538891296 held in the name of Bullpix

Solutions LLC (the "Bullpix Account") and all monies, funds and assets traceable thereto (the "Defendant-*in-rem*").

2.     This Court has original jurisdiction over this forfeiture action pursuant to Title 28, United States Code, Sections 1345 and 1355. Venue is proper pursuant to Title 28, United States Code, Section 1355(b)(1)(A), which provides that a forfeiture action may be brought in the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred, and pursuant to Section 1395(b) and (c) of the same title, which provides that a civil forfeiture proceeding for the forfeiture of property may be brought "in any district where such property is found" or "any district into which the property is brought."

3.     The Defendant-*in-rem* is currently held in the Seized Asset Deposit Fund account of the United States Marshals Service (the "USMS").

4.     As set forth below, the Defendant-*in-rem* is subject to forfeiture (*i*) pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and 984, as property involved in money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957, and the operation of an unlicensed money remitting business, in violation of Title 18, United States Code, Section 1960, or any property traceable to such property; and (*ii*) pursuant to Title 18, United States Code, Section 981(a)(1)(C), as property which constitutes or is derived from proceeds traceable to bank fraud, in violation of Title 18, United States Code, Section 1344.

## II. FACTUAL ALLEGATIONS

5.     Since in or about February 2022, the Federal Bureau of Investigation ("FBI"), Department of Homeland Security, Homeland Security Investigations ("HSI") and the Internal Revenue Service, Criminal Investigations Division ("IRS-CID") have been conducting a joint investigation into a money laundering network that operates in the United States and

Colombia, among other countries (the "Network"), and the activities of an individual known as Maximilien de Hoop Cartier ("Cartier").

6.     As set forth in greater detail below, the investigation revealed that: (i) the Network utilizes the U.S. financial system to, among other things, launder criminal proceeds from other countries to Colombia; (2) Cartier is a member of the Network and acts as a "US Client;" and (3) as a US Client, Cartier maintains, operates, or controls a network of U.S.-based shell companies and U.S.-based bank accounts to convert illicit proceeds in the form of Tether into usable fiat currency (like U.S. dollars), and to wire large quantities of U.S. dollars to Colombia-based shell companies.

## Background on Cryptocurrency and Tether

7.     Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency[1] or other cryptocurrencies.[2] Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers. Although not usually stored in any physical form, public and private keys used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object. Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries.

8.     Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction. Some

---

[1] Fiat currency is currency issued and regulated by a government such as the U.S. Dollar, Euro, or Japanese Yen.
[2] Examples of cryptocurrency are Bitcoin, Litecoin, and Ether.

cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

9.     Tether ("USDT") is an alternative type of cryptocurrency. Payments or transfers of value made with Tether are recorded in the blockchain network, but unlike decentralized cryptocurrencies like Bitcoin, Tether has some features of centralization. One centralized feature is that Tether is a Stablecoin or a fiat-collateralized token that is backed by fiat currencies, or currencies issued by governments like the U.S. Dollar and Euro. Tether is backed with a matching one to one fiat amount, making it much less volatile than its counterpart, Bitcoin.

10.     Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address or key. To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key"). A public address is represented as a case-sensitive string of letters and numbers, approximately 26 to 36 characters long. Each public address is controlled and/or accessed through the use of a unique corresponding private key-the cryptographic equivalent of a password or PIN-needed to access the address. Only the holder of an address's private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

11.     Although cryptocurrencies such as Bitcoin and Tether have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering and is frequently used as a means of payment for illegal goods and services. By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track transactions.

12.     Drug trafficking organizations ("DTOs") use the international trade and financial systems to transfer money obtained through the sale of narcotics in the United States across international borders and disguise the illicit origins of the proceeds. Specifically, after drugs are sold for dollars in the United States or elsewhere, a foreign DTO typically may extend a "contract," which is an offer to purchase the narcotics proceeds, to a money laundering broker. Once the U.S. dollars are delivered to the broker or agents of the broker, typically through a bulk cash pickup in the United States, the broker will then transfer funds or goods to the foreign DTO at their direction; recently, at least some DTOs are using cryptocurrency. For example, after the bulk cash pickup, the broker will transfer an agreed amount of cryptocurrency to a cryptocurrency wallet owned or controlled by the foreign DTO.

### The Investigation into Cartier and the Network

13.     In or about February 2022, investigators learned that Cartier maintains, operates, or controls various U.S.-based shell companies (the "Companies"), including Bullpix Solutions LLC ("Bullpix").  Bullpix was incorporated in or about November 2020 and Cartier is listed as the billing, communications, and mail forwarding contact.

14.     Cartier opened numerous bank accounts for the Companies, including the Bullpix Account, and in doing so, he indicated on the account opening documents that the Companies were in the business of software or technology, when in fact, Cartier was using the Companies to operate as unlicensed money remitting businesses related to the operation of a cryptocurrency exchange, and concealing the true source of funds which he funneled through the Bullpix Account.

15.     Cartier told an undercover FBI agent that he uses the Companies to conceal the fact that they "basically do cryptocurrency," to conceal the source of funds as cryptocurrency, and to avoid banks closing his accounts.

16. A confidential source with the FBI ("CS-1")[3] who knew and worked with Cartier advised that since at least in or about January 2020, Cartier has wired tens of millions of U.S. dollars from his U.S.-based bank accounts for three of the Companies to the CS-1's shell companies in Colombia (the "CS-1 Companies"). The transfers were done pursuant to fake services contracts - none of the CS-1 Companies performed any work pursuant to those contracts. CS-1 indicated that the transfers were made as part of the Network to convert USDT, which were proceeds of illicit activity, to fiat currency.

17. According to CS-1, between in or about May 1, 2023 and November 29, 2023, Cartier worked with other members of the Network, including CS-1 (the "Cartier Cell") to launder approximately $14.5 million USDT over the course of approximately 62 movements of USDT/fiat currency through the Network. Often, Cartier instructed CS-1 to transfer USDT that CS-1 had received from other members of the Cartier Cell, to cryptocurrency wallets under Cartier's control that were hosted by certain cryptocurrency exchanges. Cartier then received a deposit of U.S. dollars from these exchanges into the Bullpix Account.

18. Investigators reviewed bank records, audio and text messages between CS-1 and Cartier, and an email account belonging to Cartier, which revealed:

    a. As part of his money laundering efforts for the Network, Cartier maintained cryptocurrency wallets at certain cryptocurrency exchanges (referred to herein as "Exchange-1" and "Exchange-2").

---

[3] CS-1 was charged by federal complaint with conspiracy to commit money laundering and operation of an unlicensed money remitting business. That complaint has been dismissed, but CS-1 has been cooperating with law enforcement ever since, based on the understanding that CS-1 will plead guilty to those charges and in the hopes of obtaining leniency at sentencing. Information provided by CS-1 has been proven reliable and has been corroborated by, among other things, law enforcement seizures of drugs, surveillance, recorded phone calls, recorded meetings, bank records, and arrests of narcotics traffickers.

      b.      Cartier used these cryptocurrency exchanges to convert USDT that he received from CS-1 (and other members of the Network) to fiat currency to send to Colombia and other countries.

19.      According to the bank records obtained from Wells Fargo of the Bullpix Account, investigators learned the following:

      a.      The Bullpix Account is a Wells Fargo Navigate Business Checking account that was opened on or about November 24, 2021 in the name of Bullpix, and Cartier is a signer on the account.

      b.      Between in or about April 2023 and January 2024, the Bullpix Account received approximately $79,285,799 USD from Exchange-1.

      c.      Between in or about March 2023 and in or about October 2023, the Bullpix Account received approximately $22,070,179 USD from Exchange-2.

      d.      Cartier sent funds from the Bullpix Account to accounts in Colombia held by Colombian companies owned, operated, or maintained by his co-conspirators (the "Colombian Companies").

20.      In total, Cartier transferred approximately $14.4 million U.S. dollars from the Bullpix Account to bank accounts in Colombia belonging to the Colombian Companies. All of these transfers were made pursuant to fake technology or software services contracts, which were used to justify the transfers to the Colombian banks.

21.      Cartier was paid a commission for laundering illicit proceeds on behalf of other members of the Cartier Cell, which he usually took after converting the USDT to U.S. dollars but before transferring the U.S. dollars from the Bullpix Account to one of the Colombian Companies' accounts.

22.     Based on criminal history records; recorded conversations between CS-1 and members of the Cartier Cell; and conversations with CS-1, other confidential sources, and foreign law enforcement officials; investigators believe that the funds laundered by the Cartier Cell between in or about May and November 2023 represented the proceeds of drug trafficking for the following reasons, among other reasons:

a. On or about September 15, 2023, CS-1, at the direction of law enforcement, met with two other members of the Cartier Cell ("CC-1" and "CC-2") and another individual. During that conversation, in substance and in part, CC-1 acknowledged that margins were tight because "merca" is cheap everywhere and business is good. Shortly thereafter, CC-1 acknowledged a newspaper article that was published a few days earlier that discussed how cocaine is the main export of Colombia. Investigators have learned that "merca" is commonly used by drug dealers to reference drugs. Later in the conversation, CC-1 explained to CS-1 that "it's not like I bring the drugs, sell the drugs and collect the money to go down to buy Tether, no." CC-1 then continued: "There are people who do that; I buy and that's it." Investigators believe that CC-1 is advising CS-1 that CC-1 does not sell drugs personally but rather that CC-1 works or is associated with "people who do that" and he buys the Tether that represents the proceeds of drug trafficking.

b. On or about September 21, 2023, at the direction of law enforcement, CS-1 had a recorded call with CC-2. During that call, CS-1 said to CC-2, "you know the money we handle comes from drug trafficking, right?" CC-2 responded that the "money comes from there but cryptocurrency is being sold"—a reference to the laundering with the Network.

c. In or about October 2023 and November 2023, at the direction of law enforcement, CS-1 arranged a controlled purchase of cocaine paste from CC-2, her husband/partner, and her brother-in-law. Payment for the deal was made in Tether to a particular

cryptocurrency wallet provided by CC-2. CC-1 and/or CC-2 had previously used that cryptocurrency wallet to send Tether to CS-1 for purposes of laundering money through the Cartier Cell on approximately six different occasions.

          d. In or about April 2021, agents with the Drug Enforcement Administration ("DEA") seized bank accounts at a particular bank in the name of some of the Companies because those Companies had received approximately $937,648.98 U.S. dollars in total in suspect drug proceeds from an undercover DEA account.

23.    Neither Cartier nor Bullpix are currently registered with the State of New York to operate as a business engaged in the transfer of funds, nor are they registered with the Financial Crimes Enforcement Network ("FinCEN") to operate as a money services business.

24.    To date, the Companies have transferred over approximately $500 million U.S. dollars out of bank accounts controlled or operated by Cartier and the Companies. Of this, hundreds of millions of U.S. dollars were transferred to foreign entities from U.S. bank accounts, some of which through intermediary banks located in the Southern District of New York and most of which came from cryptocurrency exchanges.

25.    On or about February 20, 2024, a five-count criminal complaint (the "Complaint") was filed in the Southern District of New York charging Cartier with violations of Title 18, United States Code, Sections 1344 (bank fraud), 1956 (laundering of monetary instruments), 1957 (engaging in monetary transactions in property derived from specified unlawful activity), 1960 (operating an unlicensed money remitting business), and 2 (aiding and abetting).

26.    On or about March 7, 2024, a grand jury sitting in the Southern District of New York returned a six-count superseding indictment, which charged Cartier with violations of Title 18, United States Code, Sections 1344 (bank fraud), 1956 (laundering of monetary

instruments), 1957 (engaging in monetary transactions in property derived from specified unlawful activity), 1960 (operating an unlicensed money remitting business), and 2 (aiding and abetting).

## III. STATUTORY BASIS FOR FORFEITURE

**Forfeiture Under 18 U.S.C. § 981(a)(1)(A)**
**(Property Involved in a Transaction or Attempted Transaction in Violation of 18 U.S.C. §**
**1956 or Property Traceable to Such Property)**

27      Paragraphs 1 through 26 of this Complaint are repeated and re-alleged as if fully set forth herein.

28.      Pursuant to Title 18, United States Code, Section 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1956, or any property traceable to such property, is subject to forfeiture to the United States.

29.      18 U.S.C. § 1956(a)(1)(A)(i) & (a)(1)(B)(i) imposes a criminal penalty on any person who:

> knowing that the property involved in a financial transaction
> involves the proceeds of some form of unlawful activity, conducts
> or attempts to conduct such a financial transaction which in fact
> involves the proceeds of specified unlawful activity . . .
>
> (A)(i) with the intent to promote the carrying on of specified
> unlawful activity;
>
> (B)      knowing that the transaction is designed in whole or in part
> (i)  to conceal or disguise the nature, the location, the source, the
> ownership, or the control of the proceeds of specified unlawful
> activity[.]

30.      Section 1956(c)(4) defines "financial transaction" as "a transaction which in any way or degree affects interstate or foreign commerce . . . involving the movement of funds by wire or other means or . . . a transaction involving the use of a financial institution which is

engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree
. . . ." And Section 1956(c)(3) defines the term "transaction" to include "a deposit, withdrawal,
transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any
stock, bond, certificate of deposit, or other monetary instrument, use of a safe deposit box, or any
other payment, transfer, or delivery by, through, or to a financial institution, by whatever means
effected . . . ."

31.     Pursuant to 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1), bank fraud (in
violation of 18 U.S.C. § 1344) is a "specified unlawful activity" as that term is used in § 1956.

32.     Title 18, United States Code, Section 1344 provides, in relevant part:

> Whoever knowingly executes, or attempts to execute, a scheme or
> artifice –
> (1) to defraud a financial institution; or
> (2) to obtain any of the moneys, funds, credits, assets, securities, or
>     other property owned by, or under the custody or control of, a
>     financial institution, by means of false or fraudulent pretenses,
>     representations, or promises;
> shall be fined not more than $1,000,000 or imprisoned not more
> than 30 years, or both.

33.     By reason of the foregoing the Defendant-*in-rem* is subject to forfeiture to
the United States pursuant to Title 18, United States Code, Section 981(a)(1)(A) as property
involved in a money laundering transaction or an attempted money laundering transaction, in
violation of Title 18, United States Code, Section 1956, or as property traceable to such property.

**Forfeiture Under 18 U.S.C. § 981(a)(1)(A)**
**(Property Involved in a Transaction or Attempted Transaction in Violation of 18 U.S.C. §
1957 or Property Traceable to Such Property)**

34.     Paragraphs 1 through 33 of this Complaint are repeated and re-alleged as
if fully set forth herein.

35.     Pursuant to Title 18, United States Code, Section 981(a)(1)(A) any

property, real or personal, involved in a transaction or attempted transaction in violation Title 18, United States Code, Section 1957, or any property traceable to such property, is subject to forfeiture to the United States.

36.     18 U.S.C. § 1957 imposes a criminal penalty on any person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." Section 1957(f)(1) defines "monetary transaction" to include the "deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds . . . ."

37.     Section 1957(f)(3) defines "specified unlawful activity" to have the same meaning as given in Section 1956. As set forth above, bank fraud, in violation of 18 U.S.C. § 1344, is a specified unlawful activity for purposes of Section 1956.

38.     By reason of the foregoing the Defendant-*in-rem* is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(A) as property involved in a money laundering transaction or an attempted money laundering transaction, in violation of Title 18, United States Code, Section 1957, or as property traceable to such property.


**Forfeiture Under18 U.S.C. § 981(a)(1)(A)**
**(Property Involved in a Transaction or Attempted Transaction in Violation of 18 U.S.C. § 1960 or Property Traceable to Such Property)**

39.     Paragraphs 1 through 38 of this Complaint are repeated and re-alleged as if fully set forth herein.

40.     Pursuant to Title 18, United States Code, Section 981(a)(1)(A) any property, real or personal, involved in a transaction or attempted transaction in violation Title 18, United States Code, Section 1960, or any property traceable to such property, is subject to

forfeiture to the United States.

41.    18 U.S.C. § 1960 imposes a criminal penalty on any person who "…
knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed
money transmitting business." 18 U.S.C. § 1960(a). Section 1960(b)(1) defines the term
"unlicensed money transmitting business" as a money transmitting business which affects
interstate or foreign commerce in any manner or degree and –

> (A) is operated without an appropriate money transmitting license in a State
> where such operation is punishable as a misdemeanor or a felony under State
> law…
> (B) fails to comply with the money transmitting business registration
> requirements under section 5330 of Title 31, United States Code, or regulations
> prescribed under such section; or
> (C) otherwise involves the transportation or transmission of funds that are
> known to the defendant to have been derived from a criminal offense or are
> intended to be used to promote or support unlawful activity;

18 U.S.C. § 1960(b)(1).

42.    Section 1960(b)(2) defines the term "money transmitting" as "transferring
funds on behalf of the public by any and all means including but not limited to transfers within
this country or to locations abroad by wire, check, draft, facsimile or courier;

43.    By reason of the foregoing the Defendant-*in-rem* is subject to forfeiture to
the United States pursuant to Title 18, United States Code, Section 981(a)(1)(A) as property
involved in a money laundering transaction or an attempted money laundering transaction, in
violation of Title 18, United States Code, Section 1960, or as property traceable to such property.

**Forfeiture Under 18 U.S.C. § 981(a)(1)(C)**
**(Property Constituting or Derived from Proceeds Traceable to a Violation of 18 U.S.C.**
**§§ 1344, or Property Traceable to Such Property)**

44.     Paragraphs 1 through 43 of this Complaint are repeated and re-alleged as if fully set forth herein.

45.     Pursuant to Title 18, United States Code Section 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity" as defined in section 1956(c)(7) of this title, or a conspiracy to commit such offense.

46.     As set forth above, for purposes of Section 1956, "specified unlawful activity" includes bank fraud, in violation of 18 U.S.C. § 1344.

47.     By reason of the foregoing the Defendant-*in-rem* are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) as property constituting or derived from proceeds traceable to a violation of Title 18, United States Code, Section 1344, or as property traceable to such property.

**Forfeiture Under 18 U.S.C. § 984**
**(Civil Forfeiture of Fungible Property)**

48.     Paragraphs 1 through 47 of this Complaint are repeated and re-alleged as if fully set forth herein.

49.     Section 984 of Title 18, United States Code, provides, in pertinent part:

(a)(1) In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution (as defined in section 20 of this title), or precious metals–

(A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

(B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

(2) Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

\* \* \*

(d) Nothing in this section may be construed to limit the ability of the Government to forfeit property under any provision of law if the property involved in the offense giving rise to the forfeiture or property traceable thereto is available for forfeiture.

40.     By reason of the foregoing the Defendant-*in-rem* is fungible property and is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 984.


## IV. CONCLUSION

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant-*in-rem* and that all persons having an interest in the Defendant-*in-rem* be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant-*in-rem* to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
          June 27, 2024

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for the Plaintiff
United States of America

By:     _____
          JENNIFER ONG

Assistant United States Attorney
26 Federal Plaza, 38th Floor
New York, New York 10278
Telephone: (212) 637-2224

## **DECLARATION OF VERIFICATION**

DANIEL LETTS, pursuant to Title 28, United States Code, Section 1746, hereby declares under penalty of perjury that he is a Special Agent with the Federal Bureau of Investigation ("FBI"); that he has read the foregoing Verified Complaint and knows the contents thereof; that the same is true to the best of his knowledge, information and belief; and that the sources of his information and the grounds of his belief are his personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

Executed on June 27, 2024

DANIEL LETTS
Special Agent
Federal Bureau of Investigation